**Opinion filed November 10, 2022**



## In The

# Eleventh Court of Appeals

_____

## No. 11-21-00126-CR

_____

## JESUS ALBINO RODRIGUEZ, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 441st District Court**
**Midland County, Texas**
**Trial Court Cause No. CR54254**

## M E M O R A N D U M   O P I N I O N

Appellant, Jesus Albino Rodriguez, was indicted for the offense of intoxication manslaughter, enhanced with two prior felony convictions. TEX. PENAL CODE ANN. § 49.08 (West 2011), § 12.42(d) (West 2019). The jury found Appellant guilty of the charged offense, and upon Appellant's plea of "true" to the enhancement allegations, the trial court sentenced him to sixty years' imprisonment in the Institutional Division of the Texas Department of Criminal Justice. On appeal,

Appellant challenges (1) the omission of a definition or guidance regarding causation in the trial court's charge and (2) the sufficiency of the evidence to support his conviction. In addition to Appellant's challenges, the State asserts that Appellant, who was found indigent, was improperly assessed court-appointed attorney's fees as costs. We modify and affirm.

## I. *Factual Background*

During the early morning hours of August 23, 2019, the Midland County dispatch received multiple 9-1-1 calls reporting that a pickup was traveling eastbound in the westbound lane on I-20. The pickup belonged to Appellant. At the same time, Carlos Mora was traveling westbound on I-20 in his vehicle, an SUV, with his wife, Marie Erica Mora, and son, Carlos Mora Jr. Appellant's pickup struck Mora's SUV head-on. As a result of the impact, Mora was killed almost instantly. The passengers in Mora's SUV were treated for minor injuries.

At trial, the State presented testimony from a 9-1-1 supervisor, two independent witnesses to the collision, Mora's wife and son, five police officers, a nurse employed by the Midland County jail who collected a sample of Appellant's blood, a forensic scientist, and a forensic pathologist.

### A. *Testimony of Ronald Shurtz*

Ronald Shurtz witnessed the collision. He testified that as he was driving eastbound on I-20 he saw a pickup enter the westbound lanes of I-20; the pickup was traveling the wrong way—eastbound. Shurtz stated that he immediately called 9-1-1 and began honking at and flashing his vehicle's headlights at Appellant's pickup in an attempt to get Appellant's attention. At first, he thought it was an honest mistake, but as the pickup continued to proceed east in the westbound lane, he believed that "it was just odd" and "not normal." After driving "alongside" Appellant's pickup for five to seven minutes, Shurtz saw the pickup collide with an SUV.

Shurtz stopped to assist those involved in the collision. Shurtz first came upon Appellant's pickup; Appellant was in the driver's seat. After asking Appellant twice if he was "okay" Appellant mumbled and responded "yes." Shurtz then approached Mora's vehicle to assist the Mora family in exiting their SUV. Shurtz testified that when he checked on the driver (Mora), Mora turned his head slightly but thereafter was unresponsive; Shurtz also checked for a pulse but could not find one. After Carlos Jr. was removed from the SUV, police and emergency medical services (EMS) arrived.

B. *Testimony of Kyle Walker*

Kyle Walker also witnessed the collision and the events that preceded it. He testified that he also was traveling eastbound on I-20 when he saw a pickup driving east on the westbound side. Walker attempted to get Appellant's attention, and he flashed his vehicle's headlights at the oncoming cars. Walker saw two or three cars swerve out of Appellant's path. He then noticed a "pack of cars" traveling westbound, and he saw Appellant's pickup strike an SUV "head on."

Walker then stopped his vehicle to assist the occupants in the SUV. Walker checked on the driver of the SUV, Mora, and observed that Mora was slumped over and bleeding from his nose. Walker then checked for Mora's pulse and did not find one. After EMS arrived on the scene, Walker testified that as he was escorted back to his vehicle, he passed Appellant standing by his pickup; Appellant appeared to be "drunk" and had "the drunk million dollar stare."

C. *Testimony of Marie Mora and Carlos Mora Jr.*

Carlos Jr. and Marie were in the family's SUV with Mora. They were traveling from Fort Worth to California. Concerning the moments before the crash, Marie testified: "All I know is that [Appellant] was going to hit us. He was in front of us." Carlos Jr. testified that he heard his mother shout words in Spanish that mean "watch out." Carlos Jr. stated that when he opened his eyes, he immediately noticed

3

that Appellant's pickup was directly in front of them and that his father had no time to turn or swerve.

D. *Testimony of Jane Aranda*

Deputy Jane Aranda is an investigator with the Midland County Sheriff's Office. She was the first officer to arrive at the scene and she testified that both vehicles had "front-end damage" and that the SUV had "extensive front-end damage." When Deputy Aranda approached Appellant's pickup, Appellant was seated in the driver's seat. Deputy Aranda observed that Appellant's eyes were "pretty red and glassy" and that he had wrist bands on both wrists which was indicative of someone who had been "ID'ed" at an establishment that sells alcohol.

During her interactions with Appellant that morning, Deputy Aranda testified that Appellant was "extremely calm" for someone who had just been involved in a major accident. She also stated that Appellant never attempted to assess the damage to his pickup or Mora's SUV; he showed no concern or awareness for anyone else in the roadway and did not seem to be aware that another vehicle had been involved in the collision. Deputy Aranda, who had seven years of experience as a law enforcement officer, could not recall ever encountering a situation where someone driving the wrong direction on a divided highway was sober.

E. *Testimony of Hailee Pepper and Theresa Salazar*

Hailee Pepper is an officer with the Midland Police Department; she was the arresting officer. She testified that when she approached Appellant, she could "immediately smell alcohol" and she noted the wristbands on Appellant's wrists that "you get usually when you go into bars." Officer Pepper also observed that Appellant had "extremely slurred speech," was "very wobbly," and had a difficult time walking. After being assessed by EMS, Appellant refused to be transferred to the hospital; Officer Pepper then placed Appellant under arrest and transported Appellant to the hospital in her patrol vehicle.

4

While in route to the hospital, Appellant was "nodding off." When he spoke, Officer Pepper had difficulty hearing him, and his speech was "slurred." Appellant asked Officer Pepper repeatedly if he could speak to his wife and had to be told at least four times during the transport that he was under arrest. After Appellant was taken to the hospital, where he refused treatment, Officer Pepper transported Appellant to the Midland County jail.

After arriving at the Midland County jail, Officer Pepper obtained a warrant to draw a sample of Appellant's blood for intoxication testing purposes. The blood kit was subsequently tested and analyzed by Theresa Salazar, a forensic scientist with the Texas Department of Public Safety Crime Laboratory. Salazar testified that the toxicology results revealed that Appellant's blood alcohol content/level was 0.178 grams per 100 milliliters of blood, which was over twice the legal limit of 0.08 grams.

F. *Testimony of Riki Aguirre, Richard Moore, and Jonathon McKown*

Riki Aguirre, an officer in the traffic division of the Midland Police Department, investigated the circumstances of the collision. While Officer Aguirre could not compile a complete reconstruction of the collision, he testified that he could discern that the Mora SUV was traveling westbound on I-20 and Appellant's pickup was traveling eastbound on I-20 in the westbound lanes.

Officer Richard Moore, an accident reconstruction expert with the Midland Police Department, testified that "[c]onsidering the roadway layout, the markings that I had and the damage on both vehicles, there was only one way that this collision could have occurred, and that's if the blue Dodge Ram [Appellant's pickup] was [traveling] eastbound in the westbound travel lane. More specifically, in the right-hand eastbound travel lane."

Detective Jonathon McKown, a trained computer forensic analyst with the Midland Police Department, testified that an analysis of Appellant's cell phone

revealed a string of text messages from the night of August 22, 2019, indicating that Appellant intended to go to "Jaguars," which is a strip club located outside the city limits of Odessa. Detective McKown said he believed that Jaguars sold alcohol and that one could take I-20 to return to Midland after leaving that club.

G. *Testimony of Dr. Marc Krouse*

Dr. Marc Krouse, a forensic pathologist, performed the autopsy on Mora. Dr. Krouse determined Mora's cause of death to be "significant and lethal blunt force injuries to both his chest and his head." Dr. Krouse testified that the damage to the Mora SUV was consistent with Mora's injuries. Dr. Krouse elaborated that when the Mora SUV was struck by Appellant's pickup, the intrusion of the SUV's components compromised the occupants' space inside the SUV and resulted in the fatal injuries that caused Mora's death.

## II. *Sufficiency of the Evidence*

A. *Standard of Review*

We review a challenge to the sufficiency of the evidence, regardless of whether it is denominated as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

When conducting a sufficiency review, we consider all of the evidence admitted at trial and defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013); *Brooks*, 323 S.W.3d at 899; *Clayton v.*

6

*State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Therefore, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

Because the standard of review is the same, we treat direct and circumstantial evidence equally. *Isassi*, 330 S.W.3d at 638; *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor and can, without more, be sufficient to establish his guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper*, 214 S.W.3d at 13). A guilty verdict does not require that every fact must directly and independently prove a defendant's guilt. *Hooper*, 214 S.W.3d at 13. Instead, the cumulative force of all the incriminating circumstances may be sufficient to support the conviction. *Id.* Therefore, in evaluating the sufficiency of the evidence, we must consider the cumulative force of the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015).

B. *Analysis*

Appellant argues in his second issue that the evidence is insufficient to show that his intoxication caused the death of Mora. Specifically, Appellant claims that (1) the evidence shows that he had substantially reduced the speed of his pickup before the collision occurred whereas Mora did not decelerate or otherwise take any

evasive action to avoid the collision and (2) the effect of his intoxication on his driving ability was insufficient to account for him driving his pickup in the wrong lane and in the wrong direction on I-20. We disagree.

To be convicted of the offense of intoxication manslaughter, the State must prove beyond a reasonable doubt that (1) a person operated a motor vehicle in a public place, (2) the person was intoxicated, and (3) by reason of that intoxication, the person caused the death of another by accident or mistake. PENAL § 49.08. The term "intoxicated" means "not having the normal use of mental or physical faculties by reason of the introduction of alcohol . . . or any other substance into the body." *Id.* § 49.01(2)(A). Intoxication under this "impairment" theory of intoxication may be proven by direct or circumstantial evidence, and to establish this element, the latter is as probative as the former. *Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010); *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004); *see also Bagheri v. State*, 119 S.W.3d 755, 756 n.1 (Tex. Crim. App. 2003). The term "intoxicated" also means "having an alcohol concentration of 0.08 or more." PENAL § 49.01(2)(B).

The Penal Code further provides that "[a] person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." PENAL § 6.04(a) (West 2021). The State must prove a causal connection between the defendant's intoxication and the victim's death. *See Daniel v. State*, 577 S.W.2d 231, 233–34 (Tex. Crim. App. [Panel Op.] 1979); *Glauser v. State*, 66 S.W.3d 307, 313 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). Whether such a causal connection exists is a question for the jury's determination. *Hardie v. State*, 588 S.W.2d 936, 939 (Tex. Crim. App. [Panel Op.] 1979); *Thomas v. State*, 756 S.W.2d 59, 61 (Tex. App.—Texarkana 1988, pet. ref'd). A jury may draw reasonable

inferences regarding the ultimate facts from basic facts. *Lacour v. State*, 8 S.W.3d 670, 671 (Tex. Crim. App. 2000); *Garcia v. State*, 112 S.W.3d 839, 852 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Further, circumstantial evidence may establish a causal connection. *Garcia*, 112 S.W.3d at 852.

The record before us is replete with evidence that Appellant's conduct, alone, caused the collision and Mora's death. The testimony of Shurtz and Walker established that Appellant's pickup entered the westbound lanes of I-20 and traveled eastbound for five to seven minutes. As Mora's SUV drove toward Appellant's pickup, it was surrounded by other vehicles driving in the same direction, leaving it with no exit or a path in which to avoid colliding with Appellant's pickup. Officer Moore testified that at the time of the collision, Appellant was braking and had decreased the speed of his pickup to approximately thirty miles per hour, while Mora's SUV continued traveling at an "assumed" speed of approximately seventy miles per hour. Officer Moore further testified that the location of the damage on Mora's SUV indicated that Mora attempted to swerve right, to avoid Appellant's pickup, at the "very, very last second." Officer Moore also opined that "[t]he blue Dodge Ram operated by [Appellant] was going the wrong way down a one way roadway and caused a collision with oncoming vehicles." The jury was free to believe or disbelieve any portion of the witnesses' testimony concerning the cause of the collision, and we may presume that the jury resolved any conflicts in the evidence in favor of the verdict. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

Moreover, there is sufficient evidence that Appellant's intoxication was the cause of Appellant's erratic driving, which caused the collision. Here, there is overwhelming evidence of Appellant's intoxication: Appellant had a blood alcohol concentration of 0.178, and according to Deputy Aranda and Officer Pepper, Appellant exhibited clear signs of intoxication including red and glassy eyes, slurred

speech, drowsiness, forgetfulness, and difficulty walking. At trial, Appellant attempted to cast doubt on the testimony elicited by the State regarding Appellant's intoxication. Specifically, Appellant contended that the jury could not place confidence in the blood-drawing process and the resulting blood alcohol concentration findings, and that his apparent signs of intoxication were the result of the effects of the head-on collision, not his alleged consumption of intoxicants.

Additionally, evidence was presented that Appellant's intoxication affected his ability to drive safely. Shurtz testified that Appellant's driving the wrong way on I-20 was "just odd" and "not normal." Both Shurtz and Walker testified that for several miles, they flashed the headlights of their vehicles and honked their horns to get Appellant's attention; however, and despite their warnings and efforts, Appellant continued to drive the wrong way on I-20. Further, Deputy Aranda testified that she did not recall ever encountering a circumstance where a person, when operating a vehicle on the wrong side of the road and in the wrong direction, was doing so while sober.

Contrary to Appellant's argument, it is not necessary that the State provide an expert to opine on the effect alcohol has on a person's ability to drive safely. In fact, Texas courts have consistently held that a peace officer's testimony that a person is intoxicated, without more, can provide sufficient evidence to establish the element of intoxication. *Annis v. State*, 578 S.W.2d 406, 407 (Tex. Crim. App. [Panel Op.] 1979); *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *Henderson v. State*, 29 S.W.3d 616, 622 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). Rather, the State need only prove that Appellant's intoxication affected his ability to operate his pickup in a safe manner and that such a deficiency caused the collision and Mora's death.

We have reviewed the evidence in the light most favorable to the jury's verdict. Here, irrespective of Appellant's claims (with which we disagree), we

conclude that sufficient evidence was adduced by the State from which a reasonable factfinder could have inferred and found beyond a reasonable doubt that Appellant's intoxication caused Mora's death. Accordingly, because sufficient evidence supports Appellant's conviction for intoxication manslaughter as charged in the indictment, we overrule Appellant's second issue on appeal.

### III. *Trial Court's Charge on Causation*

#### A. *Standard of Review*

Appellate review of alleged charge error is a two-step process. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012) (citing *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). First, we must determine whether charge error exists. *Cortez v. State*, 469 S.W.3d 593, 598 (Tex. Crim. App. 2015) (citing *Kirsch*, 357 S.W.3d at 649). Second, if error does exist, we must then conduct a harm analysis to determine whether the error resulted in sufficient harm to require reversal. *Id.*; *Phillips v. State*, 463 S.W.3d 59, 64–65 (Tex. Crim. App. 2015); *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005); *Ybarra v. State*, 621 S.W.3d 371, 384 (Tex. App.—Eastland 2021, pet. ref'd).

Although "the jury is the exclusive judge of the facts," it is "bound to receive the law from the court and be governed thereby." TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007). The purpose of the trial court's charge is to "inform the jury of the applicable law and guide them in its application to the case." *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007) (quoting *Hutch v. State*, 922 S.W.2d 166, 170 (Tex. Crim. App. 1996)). Charge error stems from the denial of a defendant's right to have the trial court provide the jury with instructions that correctly set forth the "law applicable to the case." *Bell v. State*, 635 S.W.3d 641, 645 (Tex. Crim. App. 2021) (quoting CRIM. PROC. art. 36.14). Therefore, because the trial court is obligated to correctly instruct the jury on the law applicable to the case, it is ultimately responsible for the accuracy of its charge and the accompanying

instructions. *Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018) (citing *Delgado*, 235 S.W.3d at 249). As such, when the charge is inaccurate, the trial court errs, and the error is subject to a harm analysis. *See Bell*, 635 S.W.3d at 645.

The level of harm requiring reversal based on charge error depends on whether the defendant properly objected to the alleged error. *Abdnor v. State*, 871 S.W.2d 726, 732 (Tex. Crim. App. 1994). When, as here, a party failed to make a timely and specific objection to the charge, we then review the claimed error under the "egregious harm" standard articulated in *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984). *Madden v. State*, 242 S.W.3d 504, 513 (Tex. Crim. App. 2007). To constitute egregious harm, the charge error must have affected the very basis of the case, deprived the accused of a valuable right, or vitally affected his defensive theory. *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015); *Almanza*, 686 S.W.2d at 172. "Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Villarreal*, 453 S.W.3d at 433 (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)).

To determine if egregious harm exists, we evaluate the alleged error in light of (1) the entire charge, (2) the state of the evidence, including the contested issues and weight of the probative evidence, (3) the arguments of counsel, and (4) any other relevant information revealed by the trial record as a whole. *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011); *Almanza*, 686 S.W.2d at 171. As such, egregious harm is only shown, and we will only reverse, if the error was so egregious and created such harm that the defendant was deprived of a fair and impartial trial. *Villarreal*, 453 S.W.3d at 433; *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009); *Almanza*, 686 S.W.2d at 171.

B. *Analysis*

Appellant argues in his first issue that he was egregiously harmed because the charge omitted any definition of or any guidance regarding the element of "causation." We disagree. The trial court's charge provided in relevant part:

> A person commits the offense of INTOXICATION MANSLAUGHTER if the person operates a motor vehicle in a public place and is intoxicated and by reason of that intoxication causes the death of another by accident or mistake.
>
>     . . . .
>
> Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt, that the defendant, JESUS ALBINO RODRIGUEZ, on or about the 23RD OF AUGUST, 2019 in the County of Midland and State of Texas, as alleged in the indictment, did then and there operate a motor vehicle in a public place while intoxicated and by reason of that intoxication did then and there cause the death of CARLOS MORA by accident or mistake, to-wit: *by driving the wrong direction on a divided roadway, by failing to keep a lookout, by driving his vehicle into and colliding with the vehicle operated by Carlos Mora, or by consuming alcohol prior to driving or during driving, or by a combination thereof,* you will find the defendant guilty of the offense of INTOXICATION MANSLAUGHTER, and so say by your verdict, but if you do not so believe or if you have a reasonable doubt thereof, you will acquit the defendant of the offense of INTOXICATION MANSLAUGHTER and say by your verdict "not guilty" to that offense.

(Emphasis added).

Despite his assertion, Appellant was not entitled to a definition of "but for" causation in the trial court's charge. While it may arguably be the better practice for the trial court to include a "but for" causation definition in the charge, it is neither mandatory nor required. *See McKinney v. State*, 177 S.W.3d 186, 202 (Tex. App.— Houston [1st Dist.] 2005), *aff'd on other grounds*, 207 S.W.3d 366 (Tex. Crim. App. 2006); *see also* Comm. on Pattern Jury Charges, State Bar of Texas, TEXAS CRIMINAL PATTERN JURY CHARGES: INTOXICATION, CONTROLLED SUBSTANCE &

PUBLIC ORDER OFFENSES CPJC 40.18-40.19 (2019) (discussing causation instructions and recommending the inclusion of an instruction on "but for" causation when appropriate). "A jury charge on causation is called for only when the issue of concurrent causation is presented." *Hughes v. State*, 897 S.W.2d 285, 297 (Tex. Crim. App. 1994) (citing *Robbins v. State*, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986)).

Appellant argues that his actions of braking and reducing the speed of his pickup before the collision, when compared to Mora's alleged failure to apply the brakes to his SUV, to keep a lookout, or to take any other evasive action, is sufficient to warrant a jury instruction on concurrent causation. For Appellant to be entitled to a concurrent causation instruction, the record must include some evidence that a concurrent cause (Mora's actions or inaction) was clearly sufficient to have produced the ultimate result, i.e., the collision and Mora's death. *See* PENAL § 6.04(a); *Remsburg v. State*, 219 S.W.3d 541, 545 (Tex. App.—Texarkana 2007, pet. ref'd). As discussed above, Appellant's conduct was clearly sufficient to have caused and produced the ultimate result here. On the other hand, Mora's conduct was not.

Appellant was driving his pickup in the wrong direction on a divided highway. Appellant's pickup suddenly appeared in the path of Mora's SUV only seconds before the collision occurred, leaving Mora minimal, if any, time to react and take evasive actions. There is no evidence that Mora was negligent in any respect or that his actions or inaction in any way contributed to the collision. Mora's conduct consisted only of driving on I-20 in the correct direction, at the same rate of speed as other vehicles that were traveling in the same direction. In the absence of any evidence of improper conduct on behalf of Mora, evidence of his obvious inability to take evasive measures to avoid a head-on collision is not sufficient to warrant a

concurrent causation instruction. This is particularly true where, as in this instance, Appellant did not raise the issue of concurrent causation at trial.

Because Appellant failed to present evidence or arguments at trial to support the inclusion of a concurrent causation instruction in the trial court's charge, the trial court did not err when it did not include such an instruction in the charge. *See Fish v. State*, 609 S.W.3d 170, 185–86 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd) (holding that there was no evidence to support a concurrent causation instruction when a rational factfinder could not have concluded that the decedent's taking "[a]bout two" steps toward the appellant's truck, immediately before being struck and pinned against a brick pillar, was sufficient by itself to cause the decedent's death.).

Appellant further argues that, once the jury concluded that Appellant was intoxicated, the charge permitted the jury to find that he was guilty of intoxication manslaughter without requiring a finding that his intoxication resulted in an act or omission by him that caused the collision. Appellant asserts that the following charge language confused the jury and muddied the issue of causation: "by driving the wrong direction on a divided roadway, by failing to keep a lookout, by driving his vehicle into and colliding with the vehicle operated by Carlos Mora, or **by consuming alcohol prior to driving or during driving**, or by a combination thereof." When read in context with the entirety of the application paragraph, the charge does not purport to authorize a conviction under any circumstance absent a finding that *by reason of Appellant's intoxication*, Appellant did "then and there" cause the death of Mora. We conclude that the trial court's charge adequately explained the circumstances by which the jury could have determined if Appellant's conduct caused Mora's death.

Nevertheless, even if the above language in the application paragraph is deficient, Appellant was not egregiously harmed. As we have said, the charge

explained and provided alternatives for the jury to consider in determining if Appellant's intoxicated state and conduct caused Mora's death. Overwhelming evidence was presented that Appellant's state of intoxication caused him to drive the wrong direction on I-20 and that his conduct resulted in his pickup colliding "head-on" into Mora's SUV. Rather than claiming that his driving in the wrong direction on I-20 was not caused by his intoxication, Appellant's defense at trial instead focused primarily on challenging and casting doubt on the reliability of the evidence presented by the State of Appellant's intoxication. Moreover, the State in its closing argument clearly summarized its theory of connecting Appellant's intoxication to causing Mora's death by stating: "[Appellant] got on the road. He drove the wrong way. He did it because he was intoxicated, and it caused the death of Mr. Mora." The very basis of the case and Appellant's valuable rights and defensive theories were not affected. As such, Appellant was not deprived of a fair and impartial trial. Accordingly, we overrule Appellant's first issue on appeal.

## IV. *Court-Appointed Attorney's Fees*

Although not raised by Appellant, the State asserts that the trial court and the district clerk erroneously ordered and assessed court-appointed attorney's fees as costs against Appellant. We agree.

An indigent defendant cannot be taxed the cost of services rendered by his court-appointed attorney unless the trial court finds that the defendant has the financial resources to repay those costs in whole or in part. *Smith v. State*, 631 S.W.3d 484, 501 (Tex. App.—Eastland 2021, no pet.) (citing *Mayer v. State*, 309 S.W.3d 552, 556 (Tex. Crim. App. 2010)); *see* TEX. CODE CRIM. PROC. ANN. art. 26.05(g) (West Supp. 2022). The Texas Court of Criminal Appeals has held that the trial court must find that the defendant had the ability to repay court-appointed attorney's fees prior to assessing such fees against an indigent defendant. *Cates v. State*, 402 S.W.3d 250, 251–52 (Tex. Crim. App. 2013); *see also Mayer*, 309 S.W.3d

16

at 556 ("[T]he defendant's financial resources and ability to pay are explicit critical elements in the trial court's determination of the propriety of ordering reimbursement of costs and fees."). Further, a "defendant who is determined by the [trial] court to be indigent is presumed to remain indigent for the remainder of the proceedings in the case unless a material change in the defendant's financial circumstances occurs." *Cates*, 402 S.W.3d at 251 (quoting CRIM. PROC. art. 26.04(p)).

On September 16, 2019, Appellant filed an affidavit regarding indigence certifying that he did not have the necessary funds to hire an attorney for his defense. The trial court determined that Appellant was indigent and appointed trial counsel to represent Appellant's interest in all proceedings in the case. Subsequent to this appointment, the trial court did not receive evidence, nor did it issue a finding, that Appellant had the ability to pay any portion of the attorney's fees that were incurred by his court-appointed attorney. Moreover, nothing in the record indicates that (1) Appellant is no longer indigent or (2) the trial court made a subsequent determination that Appellant's financial circumstances had materially changed or that he had the financial resources or ability to pay the court-appointed attorney's fees of $10,600 that were assessed against him. Because the trial court improperly ordered that Appellant is financially responsible for the payment of the attorney's fees incurred by his court-appointed attorney, and the district clerk improperly assessed the attorney's fees as reimbursement costs against Appellant, we modify the trial court's judgment and the district clerk's bill of costs to remove the improperly assessed fees. *See Cates*, 402 S.W.3d at 252; *Smith*, 631 S.W.3d at 501.

Here, the trial court's judgment and the district clerk's bill of costs erroneously order, assess, and include attorney's fees as costs. Accordingly, we modify the trial court's judgment and the district clerk's bill of costs to delete (1) the

court-appointed attorney's fees that were ordered to be assessed against Appellant and (2) the trial court's requirement that Appellant pay such fees.

## V. *This Court's Ruling*

As modified, we affirm the judgment of the trial court. *See* TEX. R. APP. P. 43.2(b).


W. STACY TROTTER

JUSTICE


November 10, 2022

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.